STRYKER SPINE v. BIEDERMANN The issues presented on this appeal require the Court to consider de novo, the question of whether claims to one invention are patently distinct from claims to another, and in this particular instance, to determine whether one set of claims is not obvious in view of the other. Now, the issue here, of course, arises in the context of a patent interference, the purpose of which is to determine which, if either party, is entitled to a patent on the invention in question. But here, if the decision of the Board of the District Court stands, and the single interference count that has been declared here, which in Stryker's view combines two patently distinct inventions, the consequence will be not only that Biedermann will prevail in the appeal and obtain claims to an invention known as the intersecting boards invention, which Biedermann demonstrably never made and never disclosed, but Stryker's claims in its 460 patent to that invention will be lost to Stryker forever. Doesn't Figure 7 show both claims in one device? Absolutely, Your Honor, and that, of course, in our view, as of the Carbone invention date, is Carbone's invention to put them together. Obviousness, in this instance, with Biedermann as the senior party, should be determined according to conventional principles of obviousness. What would one of ordinary skill in the art, as of the invention date of Biedermann, who claims this invention as its own, be as of November 2000? Don't both Dr. Faree and Dr. Antonson agree that these are obvious in light of each other? Not at all, Your Honor. In fact, the court looked at Claim 1 of your patent, which relates to what? Intersecting planes and looked at a two-way analysis, even, and said one is obvious over the other and the other is obvious over one, based on testimony which she credited. In this instance, Your Honor, the characterization of Dr. Faree as having admitted on cross-examination and that his deposition that Claim 1, the intersecting boards, is obvious in view of Claim 18, we contend is not a fair reading of his testimony. At most, speaking of the obvious embodied testimony. But we don't have the witnesses here. The judge heard the witnesses and made a judgment that A is more credible than B. But, Your Honor, we are dealing there with, at most, opinion testimony of experts. If we look at the objective evidence in the record as to what's obvious as of November 2000, and then later go to the purported admissions of the experts, and we contend that to the extent the judge made a finding of fact about what is obvious and what is not, that's, obviousness is a question of law. Based on underlying facts. Based on underlying facts. But here, what are the facts? The facts, the most pertinent probative facts of what was obvious to those skilled in the art in November 2000, as to whether one skilled in the art in November 2000, faced with nothing but intersecting planes, would have considered it obvious to modify that structure to create the second of the at least one board. No one disputes the fact that the language is susceptible to either one board or a second board. The question for obviousness here is, would it be obvious to orient the second board, faced with just the intersecting planes, at an angle? But didn't Dr. Fareed say it would have been obvious for anyone to just snip off a corner and change the seat, the angle of the seat, and thus arrive at both intersecting planes and intersecting axes? That, Your Honor, would speak to the obviousness of Claim 18 over Claim 1. And Dr. Fareed didn't quite say it would be obvious to do that. He said that you might do that. He also suggested, again, if you look at how Biderman did it, you could trim material from the inside and then you wouldn't simply cut it off. Your Honor, I think it's important to understand that we're dealing not with pieces of wood. We're not hanging drywall here. We're talking about very, very complex devices, prosthetic devices, that are going to be implanted in the cervical region of the spine. The suggestion, and this is the linchpin of the entire obviousness argument going from Claim 18 to Claim 1, is that it would be conventional to drill a second bore normal to the plane of the second plane. But here, there is no evidence that one skilled in the art in November 2000 would have done that. Biderman approached this exact problem from several different directions. But didn't both witnesses, both experts, say in effect that that's what would have been obvious? That that would be the normal, natural thing, that if you're going to drill a bore, that you would drill a bore perpendicular to the plane of the end of the item? I would suggest, Your Honor, respectfully, that Dr. Furey, to the extent he gave testimony on cross-examination that has been characterized as an admission, in the abstract, Dr. Furey was talking about, sure, if you have a plane of surface, the normal way to do it might be to drill normal to that surface. But he was talking in the abstract. Again, we're not hanging dry wood. He made it very clear in his testimony that in the context, and only Dr. Furey of the two experts was qualified to testify about pedicle screws and these types of devices. He said, no, it would not be obvious. Even if we look at the cross-examination itself, if read in context, if we go back to the morning of August 25th, which is a couple of pages before the testimony that is quoted, where Dr. Furey purportedly admitted that it would be obvious to drill the second bore at an angle, Dr. Furey said the obvious thing to him to do would be go back to the prior arts group, drill the second bore, have it collinear, which is what the Biedermann inventors did. The most probative evidence, again, we contend, is the Biedermann inventors themselves, people who can be considered at least of ordinary if not extraordinary skill in the art, faced with the identical problem, did not find that solution. Now that, although this arises in the context of patentable distinction of one over the other, it's the identical principle to that which this Court has applied time and time again as evidence of non-obviousness. I know you disagree with the district court's conclusion on obviousness, but are there underlying findings of fact that you contend are clearly erroneous? There aren't actually that many, Your Honor, many findings of fact altogether. One finding of fact which we agree with. Is there any one that you disagree with? Any one that you contend is clearly erroneous? If it's considered a finding of fact, which I don't think it is, that the conventional way to drill a bore is normal to the plane of a surface in the context of a pedicle screw, which, again, we're talking about the size of a hairpin, and we're talking about carefully crafting the head of that screw, which is maybe the size of a Tic Tac, then we would contend that is clearly erroneous. And there is cross-examination of Dr. Anderson that supports that. Even in one of the preferred embodiments of carbone, where the contention is that carbone drills the second bore normal to the plane. That's not how the device is created. It's very carefully crafted, and there is testimony from Dr. Anderson, frankly, which can be found in the record at JA 2783-85, where he acknowledges that even in one of the carbone preferred embodiments, you could have intersecting planes, yet your intersecting bores, the second bore, is not normal to the second plane. It is at an angle, which suggests that there is a distinction drawn between the plane and the bore. This isn't a simple matter of let's take a billet of metal and just drill where we want to. Biedermann certainly didn't do that. And again, Biedermann has three illustrated embodiments to approach this problem. Every one sacrifices the integrity of the coupling. It is not because either they take material from the neck of the screw, they cut a notch into the head of the coupling element, or they cut off a corner of the coupling element, never changing the orientation of the bore. If it wasn't obvious to the Biedermann inventors as of November 2000, that's the most probative evidence we have here. And frankly, Your Honor, I don't think there's a finding of fact that the judge made. The judge basically reached a conclusion of law that this was obvious based on what it perceived to be, what she perceived to be admissions by Dr. Furey that just aren't there. Dr. Furey testified that in his opinion, what would be obvious would be to do what the Biedermann inventors did. Drill the second bore if there's going to be a second bore. Drill it concentrically. There is no hard evidence to the contrary. Now, this failure of the Biedermann inventors to do this is something that should not be lost on the defendants here and their counsel. They prevailed in Depew versus Medtronics, Your Honor, before this court in establishing non-obviousness, ironically, of a pedicle screw invention because the defendant in that case had failed to come up with the same solution. Now, the posture of the case may be different, but the principle is identical. The single most probative evidence here as of November 2000 as to what would be obvious to one skilled in the art is the failure of the Biedermann inventors to do this. And again, the lynchpin of the argument, the only basis at the end of the day upon which the district court found it was obvious, was testimony from Dr. Anderson that in the abstract, the obvious way to drill a bore is at an angle. The Biedermann inventors didn't do it. There's a preferred embodiment in Carbone, which really shows that in the context of these devices, it is independent where you drill the bore from how you cut the plane. One does not relate to the other. These are complex devices. They go through a tremendous amount of engineering. The Carbone invention, by virtue of the way it is accomplished, is the only device in this record that doesn't sacrifice the integrity of the coupling element, which could be devastating during surgery if that screw head comes out or breaks or anything of that sort. You get a lower profile. You get increased angulation where there is absolutely no contemplation anywhere in the Biedermann application of the possibility even of increased angulation. Do you want to save your rebuttal time? Yes, I do, Your Honor. Okay. Thank you. Mr. Daschle. Good morning, Your Honors. My name is Luke Daschle. I am here on behalf of Biedermann MoTeC, and the co-defendant joins us in this closing argument. Your Honors, the issue, the straightforward issue here is whether or not Stryker met its burden of proving that intersecting axes and intersecting planes are patently distinct. As Your Honors, as the panel pointed out, the district court judge, after holding an evidentiary hearing trial, a bench trial, concluded that Stryker had not met its burden. It wasn't addressed in an oral argument, but I did notice in the briefs a whole lot of time being spent in Stryker's brief on this written description issue. Written description was not before the court in this trial. The written description issue was a contingent issue and has been from the get-go, including even in front of the board. So the written description issue was an issue that would be reached if and only if there was a determination that in fact count one, the interference count that cleared, did include two patently distinct inventions. I do want to respond briefly on this notion that Mr. Biedermann – that Lutz Biedermann tried and failed to come up with an intersecting axes invention. That issue, that wasn't – that's not in evidence. I mean there's zero evidence. That's pure lawyer argument. The closest the issue came is whether or not a model that Dr. Fareed created did in fact contain intersecting axes or not, a model that Dr. Fareed intended was as figure three in the Biedermann application. That's as close as it came. So this notion that Mr. Biedermann tried and failed is just utterly without support. Let me shift on to the obviousness issue. As an initial proposition, we believe Stryker did not meet its burden right out of the gate in two respects. One, Dr. Fareed, in considering whether or not, in opining that there were in fact two patently distinct inventions in count one, considered one item of prior art and only one item of prior art, as opposed to the entire body of prior art, which he was required to do. But the fact remains that Biedermann didn't disclose intersecting bores or axes. We disagree with that, Your Honor. We do believe that intersecting axes or bores, I'm sorry, is in fact disclosed in the Biedermann application. Not to suggest that the argument is a bore, but we're talking about the disclosure. But Your Honor, the intersecting bores is our position, is in fact disclosed in the application and is in fact disclosed in figure three. But more to the point, that issue is a written description, is a question of fact, and that issue was never reached by the district court as agreed by Stryker. He took the position that that's an issue the district court did not have to reach with if it concluded that in fact count one did not include patently distinct inventions. But moving to the obviousness issue, so out of the gate, Dr. Fareed considered only the single embodiment or the single item of prior art. And point number two, in opining that the intersecting bores and intersecting planes were patently distinct, Dr. Fareed did exactly, exactly what Mr. Bush did in front of the board. That was their expert at that point. And what he did was he simply focused on the fact that count one and count 18 or claim one and claim 18, so the intersecting bores and the intersecting planes were different. Well, that's an anticipation issue, and anticipation isn't in question here. We're dealing with obviousness. The second thing that Dr. Fareed pointed out… But you've got anticipation differences that are not resolved over a long period of time. Does that tend towards a finding of non-obviousness? Well, no, because I think from an anticipation standpoint, as you pointed out, Chief Judge Rader, we have figure seven in Carbone. That, in fact, includes both. And although this wasn't tried, it wasn't part of the trial record, we do have figure three in Biedermann, which we maintain does, in fact, include both as well. Now, from a – so in the anticipation issue, Judge Rader, was strictly – we strictly focused on the language of claim 18 and the language of claim one. So if you read the language of claim 18, expressly speaking, you don't see a reference to axes or bores that intersect. So that's the point. The other point Dr. Fareed made was the fact that these things have advantages, that if you have intersecting bores, you have a certain set of advantages that you might not get with intersecting planes and vice versa. Well, that doesn't go to the issue of obviousness. And so the same evidentiary gaps that the board took Stryker to task for are evident in this record. There was simply no explanation as to why these two things were obvious. Mr. Menthik argues that if there were any findings of fact underlying the conclusion of obviousness drawn by the district court, those findings of fact simply were out-of-context generic statements that the most common way for a bore to end would be a plane perpendicular to the axis. What's your reaction to that? Well, I have two reactions to that, Your Honor. First of all, if we look at the trial record and we see what Dr. Fareed – first of all, the issue at trial were these medical devices. I mean, it's not as if we were trying a case in the abstract. So everybody was on the same page as to what was at issue. And everybody was on the same page as to who a person of ordinary skill in the art was. And so the question put to Dr. Fareed at trial, page 103, Joint Appendix 2713, was as follows. As of November 2000, the ordinary skilled artisan in the relevant art here would have understood that the standard way to end a bore is in a plane perpendicular to the axis of the bore, correct? Answer. I believe they would have viewed that as the most common way. Question. The most common way. Answer right. Question. An obvious way to end a bore, correct? Answer an obvious way. So look, we're talking about a person of ordinary skill in the art here, as the question was put, and we're talking about a person familiar with the invention here. But a second point, Judge Lind, if you look at the Carbone Patent itself, at column 13, Carbone goes through chapter and verse as to how to drill a bore into the coupling element. And so right there in the Carbone Patent itself, column 13, there's an explanation about how to drill a bore, which is exactly consistent with… What line are you referring to? I am referring to the Carbone Patent, column 13, Judge Lind. I'm at column 13. What line? We begin with line 13 with reference to figures 28A and 28B, beginning with showing a metal blank used to make a coupling element. And then if we, so there's an initial discussion, and if you drop down about the first bore and the second bore, then there's an additional discussion at line 40, actually 42. The first bore is preferably formed by drilling from the upper end toward the lower end of the coupling element. So it lays it out, and this is completely consistent with the way Dr. Andy… But where is there anything that says that the normal, natural, preferable way to do it would be normal to the point? Oh, I misunderstood your question. I mean, that was admitted at trial, but I thought the court's question was, is there any suggestion that this way of drilling a bore does apply to these medical devices? That's what I thought the question was. And the answer is, well, yes, but… Well, I'm trying to be more specific because the district court's opinion says that Dr. Free agreed that the ordinary skilled artisan would have understood that the most common way for a bore to end would be in a plane perpendicular to the axis of the bore. That's correct. And if I understood Mr. Mintley correctly, his argument was, that's a nice general statement that might apply to anything, whether you're repairing a wall in your house or anything else. But what does that have to do with the obviousness or patentable distinction between these two planes? Well, two points. Dr. Antonsen testified as well and was a bit more detailed about that. We'll put Dr. Antonsen's testimony aside. With respect to the carbone patent, the way – I mean, if you look at Figure 7, and I think that both experts agreed that Figure 7 demonstrates going about drilling a bore conventionally so that you have the longitudinal axis of the bore being normal to the plane. And if you look at column 13 in carbone, it explains you drill a bore, and it is ultimately with reference to Figure 7. So my point being is that this way of drilling bores, that this is something that you just don't drill bores when it comes to medical devices, is, I think, contradicted by the carbone patent itself, which explains how to go about dealing with these bores. So your argument is that whatever statements Dr. Frey made were made in the context of these particular devices and therefore has some bearing on this? Of course, Your Honor. Of course. That's what the trial was about. Now, we go into the factual findings, and I don't know – I mean, the court is obviously very familiar with the record. Judge, you were right. Judge Lurie, the court did, in fact, undertake an analysis both ways to test whether or not there was indistinctness in either direction. And after undertaking that analysis, the court concluded that Stryker had failed to meet its burden of proof, and then some, because I think the district court went actually further and found that these things, in fact, were not obvious. She didn't have to go that far, but the court did, given the overwhelming evidence, as Your Honor has pointed out, from both experts. So I think, Your Honor, unless the panel has additional questions, I would leave it at that. Thank you. All right. Thank you. Mr. Mentlick, you have over three minutes. Thank you, Your Honor. Your Honor, we come back again to the fundamental question of, is it obvious to change Claim 18 to come up with Claim 1? We need a motivation to make the change. Everyone agrees that Claim 18 says nothing about having intersecting bores. Using the Carbone disclosure against Carbone violates principles that this court has enunciated on numerous occasions. The obviousness has to come from the art, from the state of the art. But wouldn't one of skill in the art reading Carbone reach conclusions, and isn't that what is the subject of this entire trial? Again, Your Honor, we think more probative than what Carbone says almost a year after the invention date as of which we should be measuring obviousness should not be used against it. Let's look at what Biedermann did. Biedermann did not drill conventionally, Figure 2 of what's said to be conventionally. Carbone Figure 2 does not drill conventionally. It has non-intersecting claims with intersecting bores. So absent the motivation that comes from the recognition in Carbone that you get these advantages, it's just not there as far as Stryker meeting its burden of proof. If there were evidence, Your Honor, other prior art that suggested or indicated a motivation to make these changes, certainly we would have had it from Biedermann. We were proving a negative in effect. We could have put in hundreds of patents that didn't show the invention. We put in evidence, hard evidence showing non-obviousness as far as written description goes. Written description per se in the context of written description wasn't adjudicated, but it was found as a fact by the district court that Biedermann Figure 3 does not show intersecting bores. That was the only figure that was ever argued by Biedermann as even purportedly making that disclosure. In their appellate briefs, they make reference to a declaration of their expert, Dr. Anderson, which was not in evidence, and he never testified about it. As far as we're concerned, if there is a finding on this record that is clear, it's that Biedermann doesn't have intersecting bores. Didn't disclose it, didn't think of it until four years after his priority date when he copied the Carbone claims. Under those circumstances, and again, in the context of us establishing one of our indicia of non-obviousness here, namely that intersecting bores can be used independently of intersecting planes, which we don't contend is dispositive, but it is evidence of non-obviousness. We showed Carbone Figure 2, which has intersecting bores but no intersecting planes. Biedermann Figure 3 has intersecting planes but not intersecting bores. So in deciding that issue, we believe the district court clearly did find, contrary to what's being asserted now, that there is no such disclosure. Again, I come back to the consequence of not splitting this count into two demonstrably patentably distinct inventions is that Biedermann can wind up with a patent which we believe will never be enforceable because it lacks written description, but more importantly, Streicher will lose claims to which it is absolutely entitled. To say that Carbone included an embodiment where he drilled what's said to be conventionally, he certainly doesn't describe it as such. In the context of, again, designing these very complex surgical devices to be implanted, they're independent considerations, and again, we've shown that they exist independent of each other. You can have, in a preferred embodiment, intersecting bores, intersecting planes, where the bore isn't normal to the second plane. We have Figure 2. You can have intersecting bores without intersecting planes altogether. Again, Your Honor, we contend that if viewed in its entirety, there's no admission of obviousness here by Dr. Fareed in any portion of his testimony, and it's not that long, and it's in the record, I would respectfully ask the Court to read it all in context and conclude that there is no admission of obviousness here, and that, in fact, the record as a whole demonstrates the non-obviousness of the intersecting bores over intersecting planes. The inventions are patentably distinct. Thank you. Thank you, Mr. Metlick. Our next case is Razzo versus the Department of Veterans Affairs.